IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAMES HERMAN HILL, SR.,

                Petitioner,

      vs.

HUNTER ANGLEA, Warden, Sierra
Conservation Center,[1]

          Respondent.

No. 2:18-cv-03168-JKS

MEMORANDUM DECISION

James Herman Hill, a state prisoner proceeding *pro se*, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Hill is in the custody of the

California Department of Corrections and Rehabilitation and incarcerated at Sierra Conservation

Center. Respondent has answered, and Hill has not replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

Hill was charged with four counts of lewd and lascivious acts upon a child with the

allegation that he had suffered three prior serious felony convictions for lewd acts upon a child.

Hill denied the charges and allegation and proceeded to a jury trial. On direct appeal of his

conviction, the Court of Appeal laid out the following facts underlying the charges against Hill

and the evidence presented at trial:

> *The Current Offenses*
>     In December 2013, eight-year-old G. H. lived in Sacramento with her mother,
> brother, sister-in-law, infant nephew, and defendant, who was her uncle. That month, G.
> H.'s brother died and G. H.'s sister-in-law and nephew soon moved out of the house. G.
> H.'s mother, was consumed by grief and could no longer care for G. H. on a day-to-day

---

[1]    Hunter Anglea, Warden, Sierra Conservation Center, is substituted for Ken Clark,
Warden, California State Prison-Corcoran. FED. R. CIV. P. 25(c).

basis, so G. H. moved in with her mother's friend, Cecilia B.  G. H. would then come back to live with her mother on the weekends.

In the middle of January, G. H. started acting differently.  She became quiet and stopped playing, instead preferring to sit on the couch.  When Cecilia B. asked if anything was wrong, G. H. said that she was fine.  Cecilia B. told mother that G. H. was acting depressed and that mother needed to talk to G. H.

On March 16, 2014, mother asked G. H. whether [Hill] touched her inappropriately.  Mother suspected [Hill] molested G. H. because he stared at her more than usual and would act strange when mother told G. H. to cover herself in front of him.  Also, G. H. would cling to mother when the two were around [Hill].  Mother noticed these changes in February 2014.  When first asked, G. H. denied [Hill] touched her; however, she soon admitted [Hill] in fact touched her once, a week before.  G. H. told mother [Hill] "took her in the back and he did what he did," but she never actually described what [Hill] did to her.  Around the same time G. H. told her mother about the abuse, she told others that [Hill] had abused her only once.  Before trial, however, mother told G. H. that she knew [Hill] had abused her more than once, and G. H. admitted that it had occurred five times.

G. H. testified that [Hill] "put his thing in my thing" five separate times.  The abuse started after her brother died and when she would visit her mother on weekends.  Each time, G. H.'s mother was in a different area of the house or outside and could not hear G. H. when she screamed for help.  [Hill] abused G. H. the same way each of the five times.  The abuse occurred when G. H. went to her toy room to retrieve a toy.  [Hill] would push her against the wall outside the room, pull down her pants, and unzip his own pants.  He would then "put his thing in [her]," which G. H. thought was uncomfortable and hurt.  [Hill] kept his "thing" inside of her for a "few seconds," which G. H. described as being hard.  He did not say anything to her during the abuse but did cover her mouth during two of the encounters.

After [Hill] first abused G. H., she did not tell anybody about what had happened because she was scared.  She also did not tell anybody after the second, third, fourth, or fifth time because she was scared.  G. H. admitted that she denied anything happened when her mother first asked her whether [Hill] had touched her.  It was only after her mother started to cry that G. H. told her [Hill] had touched her.  She told mother it happened only once because her mother told her not to say anything more and because she was sad and crying.  G. H. also told the police and "a lady who interviewed her" that [Hill] abused her only once.  It was not until November 2015 that she admitted [Hill] had actually abused her five separate times.

G. H. had no evidence of tears or recently healed injuries to her genitalia.  Because of her age, it was not uncommon for injuries to that area of the body to heal quickly or withstand penetration without injury.

Blake Carmichael, Ph.D., testified about child sexual assault victims' common behaviors and circumstances of disclosure following their abuse.  He had never met or talked with G. H. and was unfamiliar with her case.  As part of his testimony, he articulated the percentage of children who fail to disclose their abuse within the first year or who fail to disclose when directly asked about known abuse.  He also testified about

concepts of incremental disclosure and child suggestibility. On the topic of child suggestibility, Dr. Carmichael testified that children older than five years old tend to be less suggestible. For children under five, a person usually has to repeatedly tell a child misinformation for them to integrate that information into a narrative. It is very rare for a child to make a false allegation of sexual abuse. False allegations do occur in 30 to 40 percent of cases when the allegation is made in the context of a custody dispute and an adult initiates the complaint. On the other hand, only 0 to 2 percent of allegations initiated by children have later been proven false. These statistics were based on studies where the abuse was confirmed through medical records, a perpetrator's confession, or a social service finding.

Following G. H.'s disclosure to mother, mother gave police officers some of [Hill's] property he left at her house. Included among his belongings were a bottle and box of pills labeled CYVITA, which the packaging described as male enhancement supplements. Among the packaging were also solicitations for both male enhancement drugs and adult pornographic magazines. There were no pornographic magazines among [Hill's] property but there were two adult pornographic DVD's. Also among [Hill's] property was a black binder with condoms in it. None of the items recovered involved child pornography.

*[Hill's] Prior Acts Of Sexual Misconduct*

[Hill's] daughter V. H. testified about [Hill's] prior acts of sexual misconduct. When V. H. was young, [Hill] took care of the house and the children while her mother worked. When V. H. was eight or nine years old, her father repeatedly made her give him oral sex before he would get on top of her while she was naked from the waist down and he was in his boxer shorts. [Hill] would put his naked penis near V. H.'s vagina but would not put it inside of her vagina. The abuse occurred at multiple homes V. H. lived in with her family, including the house where [Hill] abused G. H. V. H. did not remember where in that house [Hill] molested her.

[Hill] would never sexually abuse V. H. when other adults were around; however, she believed her siblings were nearby but never in the same room when the abuse occurred. [Hill] would come up with an excuse to make V. H. stay with him so he could molest her while her siblings went off to do something else. For example, [Hill] would make V. H. stay with him to do chores or so he could fix her hair.

Every time [Hill] molested V. H., it happened the same way. First he would have her give him oral sex, then he would get on top of her, and then he would ejaculate. Every time [Hill] molested her, he would tell her that it was the last time. He would also tell her not to tell anyone. They never talked about the abuse except while he molested her. The sexual abuse continued until V. H. was 11 or 12 years old, when she told her mother.

Based on this conduct, [Hill] pled no contest to three counts of lewd and lascivious acts on a child under the age of 14. He sought to have his convictions and prior misconduct excluded from evidence because they were remote, in that he was convicted in 1996, and because the conduct was not similar to the conduct he allegedly committed against G. H.

The court ruled that the evidence of [Hill's] prior acts of sexual misconduct was admissible under Evidence Code 1 section 1108. Although [Hill's] prior offenses occurred in 1996, the offenses were sufficiently similar to the present case to warrant admission. Both V. H. and G. H. were between the ages of eight and ten when [Hill] assaulted them, [Hill] was related to both of them and had access to them because of that relationship, both assaults occurred in the same residence, and the assaults contained similar types of sexual offenses, including the removal of clothes followed by [Hill] rubbing his penis on or in the minor's body.

The court further found that the evidence was not inadmissible under section 352. [Hill] pled to the early charges, thus there was indisputable certainty of the commission of the prior offenses, serving to increase their probative value. Further, the fact that the prior acts resulted in convictions removed the likelihood that the jury would punish [Hill] in the current case because of his conduct toward V. H. Finally, the prior acts were no more serious than the current ones, so the jury would not be overwhelmed by the emotional impact of those acts.

During her closing argument, the prosecutor used [Hill's] prior misconduct to argue he committed the crimes charged. She ended her closing argument by stating V. H. was a credible witness whose pain, even 20 years after her molestation at the hands of [Hill], was what was ahead for G. H. The prosecutor then summarized [Hill's] sexual abuse toward G. H. and stated, "you cannot protect a society without enforcing the laws of the land. [¶] The laws in this country are designed to protect children like [G. H.] and [V. H.] from these types of abuse. It's my job and yours to uphold the laws of this state. Protect [G. H.] and those who come after her by holding [Hill] accountable for his actions. Hold him accountable by finding him guilty as charged."

*People v. Hill*, No. C082995, 2017 WL 4053221, at *1-3 (Cal. Ct. App. Sept. 14, 2017).

At the conclusion of trial, the jury found Hill guilty as charged and found true the prior serious conviction allegation that Hill had suffered three prior convictions for lewd acts upon a child.[2] The court sentenced Hill to four consecutive sentences of 25 years to life imprisonment, tripled, for a total indeterminate term of 300 years to life imprisonment, plus 20 years for the prior serious felony enhancement on each count.

Through counsel, Hill appealed his judgment, arguing that: 1) the appellate court should review records from the victim's therapy sessions to determine whether the trial court failed to

---

[2] The three prior convictions were committed against the same child victim and obtained through Hill's no-contest plea.

disclose impeachment evidence contained therein; 2) trial counsel was ineffective for failing to object to evidence that Hill possessed adult sexual materials; 3) trial counsel was ineffective for failing to object to expert testimony regarding the frequency of false allegations; 4) the trial court erred in admitting prior uncharged sexual misconduct; 5) the trial court erred in denying his mistrial motion based on juror misconduct; and 6) trial counsel was ineffective for failing to object to the prosecutor's closing argument. On September 14, 2017, the Court of Appeal unanimously affirmed the judgment against Hill in a reasoned, unpublished opinion. *Hill*, 2017 WL 4053221, at *13. The California Supreme Court denied review without comment on November 21, 2017. His conviction became final on direct review 90 days later, when his time to file a petition for certiorari in the U.S. Supreme Court expired on February 19, 2018. *See Jiminez v. Quarterman*, 555 U.S. 113, 119 (2009); *Spitsyn v. Moore*, 345 F.3d 796, 798 (9th Cir. 2003).

Hill then timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on December 3, 2018. Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1)(A).

## II. GROUNDS RAISED

In his *pro se* Petition before this Court, Hill argues that: 1) trial counsel was ineffective for failing to object when the court admitted evidence that Hill possessed adult sexual materials; 2) trial counsel was ineffective in failing to object to the expert testimony regarding the frequency of false accusations of child sexual assault; 3) the trial court abused its discretion and violated Hill's right to due process when it allowed the prosecution to introduce evidence of prior uncharged sexual conduct; 4) the trial court erred in refusing to order a mistrial based on juror misconduct; 5) the expert testimony regarding low frequency of false accusations was

irrelevant and inadmissible; 6) the expert testimony regarding low frequency of false accusations was tantamount to an opinion that the victim's allegations were true; 7) trial counsel was ineffective in dealing with the prosecutor's improper arguments during summation; 8) the prosecutor committed misconduct during summation when she insinuated that the jury should convict Hill to help thwart future child sexual abuse; and 9) Hill had the right to present a defense and a right to obtain confidential or privileged documents relevant to his defense.

### III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Hill has not replied to Respondent's answer. The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true." 28 U.S.C. § 2248; *see also Carlson v.*

*Landon*, 342 U.S. 524, 530 (1952). Where, as here, there is no traverse filed and no evidence

offered to contradict the allegations of the return, the court must accept those allegations as true.

*See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

## IV. DISCUSSION

### A.     Freestanding Ineffective Assistance of Counsel Claims (Ground 1)

Hill first alleges that trial counsel was ineffective for failing to object to testimony

regarding adult sexual materials that were found in Hill's possession. The Court of Appeal

considered and rejected this claim on direct appeal as follows:

> Sacramento Police Officer Kevin Patton testified that [G.H.'s] mother gave him items belonging to [Hill] that he left at her house. These items included a bottle and box of male enhancement supplements, solicitations for male enhancement drugs and adult pornographic magazines, two adult pornographic DVD's, and a binder with condoms in it. [Hill] argues that his counsel was ineffective for failing to object to the admission of this testimony, and her failure to do so resulted in prejudice against him. The problem with [Hill's] argument is that the record discloses that defense counsel had a tactical reason to not object to the admission of this evidence.
>
> On cross-examination, defense counsel questioned Officer Patton about the specifics of the items he found. She clarified that the "leaflets" for male enhancement supplements and pornographic magazines the prosecutor referred to were actually solicitations that were included with the packaging for the male enhancement supplements and not leaflets he independently sought out. Defense counsel also clarified that [Hill] was not in fact found in possession of pornographic magazines, only solicitations. Finally, defense counsel stressed that no sexually explicit material involving children was found, and that all items recovered pertained to adults. Defense counsel then took this testimony and argued during closing argument that the evidence showed [Hill] had an active sex life with adult women and, despite V. H.'s testimony, no evidence showed [Hill] was currently attracted to children. This testimony and argument show defense counsel's tactic of painting her client as a man sexually attracted to adults at the time G. H. accused him of abuse, despite having three prior convictions for lewd and lascivious conduct upon his daughter.

*Hill*, 2017 WL 4053221, at *6.

Hill fares no better on federal habeas review. To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that appellate counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. 668, 687 (1984). A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95. Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard. *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009). Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Hill must show that counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474

U.S. 52, 57 (1985).  An ineffective assistance of counsel claim should be denied if the petitioner

fails to make a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466

U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if

the defendant fails on one).

Upon independent review, the Court must conclude that the California courts' rejection

of Hill's claim was not unreasonable or contrary to clearly-established federal law.  As the Court

of Appeal explained, Hill does not show that counsel had no tactical reason for her actions, and

indeed, the record fully supports that counsel made the strategic decision to use the admitted

evidence in support of their defense strategy.  *See Strickland*, 466 U.S. at 689-90 (reasonable

tactical decision by counsel with which the defendant disagrees cannot form the basis of an

ineffective assistance of counsel claim).  Accordingly, Hill fails to show that counsel was

ineffective, and he is not entitled to relief on this claim.

**B.**  **Evidentiary Errors (Grounds 2, 3, 5, 6, 9)**

Hill next contends that the trial court made a number of evidentiary errors.  The Supreme

Court has made clear that federal habeas power does not allow granting relief on the basis of a

belief that the state trial court incorrectly interpreted the state evidence code in ruling on the

admissibility of evidence.  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*,

414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v.

DeChristoforo*, 416 U.S. 637, 643 (1974)).  In this context, the Supreme Court has defined the

category of infractions that violate fundamental fairness very narrowly, limiting them to specific

guarantees enumerated in the bill of rights.  *Estelle*, 502 U.S. at 73 (citing *Dowling v. United

States*, 493 U.S. 342, 352 (1990)).  Indeed, the Supreme Court has acknowledged its "traditional

reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). In criminal actions, "[t]he States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution." *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967).

"The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle*, 502 U.S. at 67). Where a due process violation is alleged stemming from an evidentiary challenge, federal courts review such alleged due process violations for whether admission of certain evidence "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72. A habeas petitioner "bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir.), *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005). The "[a]dmission of evidence violates due process only if there are *no* permissible inferences the jury may draw from it." *Boyde*, 404 F.3d at 1172 (quoting *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991)) (internal quotation marks omitted; emphasis in original); *see also Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (noting that the Supreme Court has not made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of a writ of habeas corpus).

1.      *Expert testimony regarding low frequency of false allegations/IAC*

Hill first challenges the prosecution's expert testimony regarding the low frequency of false accusations as a) irrelevant and inadmissible,[3] and b) tantamount to an opinion that G. H.'s allegations were true.  Hill also claims that defense counsel was ineffective for failing to object to it.

To the extent Hill claims that the trial judge abused his discretion in allowing the testimony, such claim is not cognizable on habeas review.  Although the Ninth Circuit has suggested that an abuse of discretion may also amount to a constitutional violation, *see Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc), the Supreme Court has never held that abuse of discretion is an appropriate basis for granting federal habeas relief.[4]  Indeed, quite to the

---

[3]      As an initial matter, Respondent correctly contends that Hill's challenge to the testimony as irrelevant and inadmissible is unexhausted.  This Court may not consider claims that have not been fairly presented to the state courts.  28 U.S.C. § 2254(b)(1); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing cases).  To be deemed exhausted, a claim must have been presented to the highest state court that may consider the issue presented.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  To have properly exhausted his state court remedies, Ramirez must have presented both the legal arguments and the factual basis to the highest state court.  *See Peterson v. Lampert*, 319 F.3d 1153, 1155-56 (9th Cir. 2003).  Hill raises this underlying claim for the first time in the instant Petition; it is thus unexhausted.

This Court could stay the Petition and allow Hill to return to state court to satisfy the exhaustion requirement.  *See Mena v. Long*, 813 F.3d 907, 911 (9th Cir. 2016).  However, Hill has not requested that this Court stay and hold his Petition in abeyance.  Moreover, the Supreme Court has held that it is an abuse of discretion to stay a petition pending exhaustion where: 1) the petitioner has not show good cause for failing to exhaust all available state court remedies; and 2) the unexhausted claim is "plainly meritless."  *Rhines v. Weber*, 544 U.S. 269, 277 (2005).  In his Petition, Hill provides no reason why he did not seek relief through a habeas petition to the state court.  Moreover, as discussed *infra*, the unexhausted claim is "plainly meritless."

[4]      At one time, the Ninth Circuit viewed a state court ruling to be "objectively unreasonable" if it amounted to a clear error.  *Van Tran v. Lindsey*, 212 F.3d 1143, 1152-54 (9th Cir. 2000).  This is the test the Ninth Circuit uses in reviewing a trial court decision under the abuse of discretion standard.  *United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012) (en banc).  The Supreme Court noted *Van Tran's* statement of the test and expressly rejected it as

contrary, the Supreme Court has strongly suggested that, while abuse of discretion is an appropriate standard on direct review, in a federal habeas proceeding it is not. *Renico*, 559 U.S. at 772-73 ("It is not even whether it was an abuse of discretion for her to have done so–the applicable standard on direct review. The question under the AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law." (quoting § 2254(d)(1))). A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir.2009).

Here, Hill fails to show that any state court error was so fundamentally unfair to rise to the level of a due process violation. The Ninth Circuit has noted that expert testimony about child sexual assault victims' common behaviors and circumstances of disclosure following their abuse has been admitted "in federal child-sexual-abuse trials, when the testimony concerns general characteristics of victims and is not used to opine that a specific child is telling the truth." *Brodit v. Cambra*, 350 F.3d 985, 991 (9th Cir. 2003) (citing *United States v. Bighead*, 128 F.3d 1329 (9th Cir. 1997) (per curiam); *United States v. Antone*, 981 F.2d 1059 (9th Cir.1992)). The Ninth Circuit has found that this type of general testimony "merely assist[s] the trier of fact in understanding the evidence; it [does] not improperly bolster the particular testimony of the child victim." *Antone*, 981 F.2d at 1062. In *Brodit*, a habeas case involving a similar claim, the Ninth Circuit found that where the trial court instructed the jury that such

---

inappropriate under the AEDPA. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (clear error standard is insufficiently deferential to state courts).

expert testimony could not be considered as proof that the sexual abuse occurred, the petitioner did not assert a violation of clearly established federal law in the admission of the testimony. *Brodit*, 350 F.3d at 991. Prior to deliberations, the trial court made the proper admonishments here. This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth). Because the expert testimony was not admitted to prove the ultimate question of Hill's guilt, Hill cannot show that its admission violated clearly established federal law. *Brodit*, 350 F.3d at 991.

With respect to his contention that the expert's testimony was tantamount to an opinion that the victim was credible, under federal law, there is no support for "the general proposition that the Constitution is violated by the admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact." *Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009). "[I]t is 'well-established . . . that expert testimony concerning an ultimate issue is not per se improper.' Although '[a] witness is not permitted to give a direct opinion about the defendant's guilt or innocence . . . an expert may otherwise testify regarding even an ultimate issue to be resolved by the trier of fact.'" *Id.* (internal citations omitted); *see also Duvardo v. Giurbino*, 410 F. App'x 69, 70 (9th Cir. 2011) (noting that the Supreme Court "has never held that the admission of expert testimony on an ultimate issue to be resolved by the trier of fact violates the Due Process Clause"); *Briceno v. Scribner*, 555 F.3d 1069, 1077-78 (9th Cir. 2009), *overruled on other grounds as recognized in Emery v. Clark*, 643 F.3d 1210, 1215 (9th Cir. 2011). Indeed,

14

the Ninth Circuit has recently reiterated that "because 'there is no clearly established constitutional right to be free of an expert opinion on an ultimate issue . . . the admission of the opinion testimony of [an expert] cannot be said to be contrary to, or an unreasonable application of, Supreme Court precedent.'" *Maquiz v. Hedgpeth*, 907 F.3d 1212, 1217 (9th Cir. 2018) (quoting *Briceno*, 555 F.3d at 1077-78).

It is true, however, that, under certain circumstances, expert testimony that improperly vouches for the victim's credibility may invade the province of the jury and deny the defendant a fair trial. *See Snowden v. Singletary*, 135 F.3d 732, 737-38 (11th Cir. 1998). For example, in *United States v. Charley*, 189 F.3d 1251, 1267 (10th Cir. 1999), and *United States v. Whitted*, 11 F.3d 782, 786 (9th Cir. 1993), medical doctors called as experts testified as to their opinions that the children were abused based primarily on the statements of the children that they were, in fact, abused. In those cases, the expert was merely reciting the allegation of the alleged victim "in the guise of a medical opinion," *Whitted*, 11 F.3d at 785-86, which "does nothing but vouch for the credibility of another witness . . . and therefore does not 'assist the trier of fact' as required by Rule 702," *Charley*, 189 F.3d at 1267. Thus, each court noted that the fact of whether the alleged abuse occurred was for the jury to decide, and the expert's testimony usurped the fole of the jury as the ultimate fact finder. *See Charley*, 189 F.3d at 1270; *Whitted*, 11 F.3d at 787.

Here, however, the expert explained that he had not interviewed the child victim and was speaking only about general patterns of behavior of alleged abuse victims. The testimony was limited to the expert's discussion of his studies and his experience with child sex assault victims. Although the substance of the expert's testimony may give this Court pause, the record supports the Court of Appeal's reasonable determination that the expert "did not vouch for G. H.'s

credibility and in fact testified that he had never met G. H. and did not know the facts of her case." *Hill*, 2017 WL 4053221, at *7; *see Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002), *cert. denied*, 529 U.S. 916 (2003); *see also United States v. Bighead*, 128 F.3d 1329, 1330 (9th Cir. 1997) (holding that there was nothing improper about an expert testifying about "a class of victims generally" rather than vouching for a particular witness). Hill's counsel therefore could not have been ineffective for failing to object to the admission of the expert testimony because doing so would have been futile or without consequence. *See Lockhart*, 506 U.S. at 374; *Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012) ("Counsel is not necessarily ineffective for failing to raise even a nonfrivolous claim, so clearly we cannot hold counsel ineffective for failing to raise a claim that is meritless." (internal citation omitted)).

Furthermore, Court of Appeal also concluded that defense counsel's handling of the expert testimony constituted a tactical decision that this Court may not second-guess. As the Court of Appeal reasoned:

> On cross-examination, defense counsel challenged Dr. Carmichael's testimony regarding the percentage of false child initiated accusations of sexual abuse by questioning how the studies determined a child made a false report. Dr. Carmichael responded that the studies confirmed abuse had occurred in the other reports through medical findings, a perpetrator's confession, or a social service finding. Defense counsel then questioned whether a study would determine an allegation false if there was no medical finding, no confession, and no social service report. Dr. Carmichael stated that the question of falsehood was in the hands of the jury and outside of his expertise. Later during closing argument, defense counsel argued Dr. Carmichael's testimony supported an inference that G. H. made a false report. There was no medical evidence of sexual abuse, [Hill] did not confess, and there was not a social service report confirming abuse had occurred. Thus, while Dr. Carmichael testified it was rare for a child to falsely report sexual abuse, his testimony supported an inference that G. H.'s report was false. Given defense counsel's line of questioning and her subsequent argument, the record discloses her tactical decision to use Dr. Carmichael's testimony to show G. H. made false allegations of sexual assault against [Hill]. Thus, [Hill's] argument that counsel should have done more than discredit Dr. Carmichael's testimony is unavailing because counsel used Dr. Carmichael's testimony to try to affirmatively show G. H.'s allegations were

false.  Accordingly, defense counsel's failure to object to Dr. Carmichael's testimony was not ineffective.

*Hill*, 2017 WL 4053221, at *7.

Such determination is both reasonable and fully supported by the record.  Hill is thus not entitled to relief on any argument advanced in support of this claim.

### 2. *Evidence of prior uncharged acts of sexual misconduct*

Hill also contends that the trial court erred in admitting testimony from Hill's daughter, V.H., about the details of Hill's sexual assaults against her because the probative value of the evidence was outweighed by its prejudicial effect.

California Evidence Code § 1108 allows the prosecution to prove a defendant's propensity to commit sex crimes by offering evidence that he has committed other sex crimes.  It is an exception to the general rule, reflected in § 1101, that propensity evidence is not admissible.  *See* CAL. EVID. CODE §§ 1101(a), 1108(a).  The relevant portion of § 1108 provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."  Section 1108 is analogous to Federal Rule of Evidence 413, which provides that, "[i]n a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault."  FED. R. EVID. 413(a).

To the extent Hill argues that the trial court under state law, he cannot prevail on such claim because, again, "[i]ncorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected."  *Lincoln v. Sunn*, 807 F.2d 805,

816 (9th Cir. 1987). So, even if the trial court erred in its application of §§ 352 and 1108, such error is not a ground for federal habeas relief. *See Estelle*, 502 U.S. at 67-68.

Moreover, the Ninth Circuit has repeatedly barred federal habeas petitioners from challenging the constitutionality of prior sexual misconduct evidence admitted to show propensity pursuant to California Evidence Code § 1108. *See, e.g., Greel v. Martel*, 472 F. App'x 503, 504 (9th Cir. 2012) ("Ninth Circuit precedent 'squarely forecloses [the] argument' that admission of evidence of sexual misconduct to show propensity violates due process.") (quoting *Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008)); *Sanches v. Hedgpeth*, 381 F. App'x 710, 711 (9th Cir. 2010) ("[T]he Supreme Court has never held that the admission of prior sexual misconduct to lend credence to a victim's claims to be unconstitutional."); *Mejia*, 534 F.3d at 1046 (on AEDPA review, upholding admission of evidence of prior uncharged sexual offenses in support of rape charges). In so holding, the Ninth Circuit has cited the United States Supreme Court's express refusal to decide the issue. *See Estelle*, 502 U.S. at 75 n.5 ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime.").

In the absence of clearly established Supreme Court law on this issue, AEDPA relief is foreclosed. *See Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009) ("it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (citations and internal quotations omitted); *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, . . . it cannot be said that the state court unreasonably applied

clearly established Federal law") (citation, internal brackets and quotations omitted). Because the state courts' rejection of this claim was not contrary to, or an unreasonable application of, any clearly established Federal law as determined by the United States Supreme Court, Hill's challenge must fail.

### 3.     *Confidential documents*

In a single line of his Petition, Hill states that "[a] criminal defendant has a right to present a defense and thus, in certain situations, has a right to obtain confidential or privileged documents if they are relevant to my defense." Construing Hill's *pro se* petition liberally, it appears that Hill now challenges, as he did on direct appeal, the trial court's rejection of his request for the subpoenaed confidential mental health records of the victim.

It is well-settled that a criminal defendant has a constitutional right to present a defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). This right is not, however, without limitation. "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *United States v. Scheffer,* 523 U.S. 303, 308 (1998); *see Crane,* 476 U.S. at 689-690; *Marshall v. Lonberger,* 459 U.S. 422, 438, n.6, (1983); *Chambers v. Mississippi,* 410 U.S. 284, 302-303 (1973); *Spencer v. Texas,* 385 U.S. 554, 564 (1967). "Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury. The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate." *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005) (citations

omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (holding due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion).       Moreover, good cause to compel production of confidential records in a criminal action does not entitle a defendant to receive them.  Rather, the custodian of the records forwards them to the court and, if good cause exists, the court reviews them *in camera*, balancing the defendant's right of confrontation against the subject of the record's right of privacy, and determine which records, if any, are essential to the defendant's right of confrontation.  *See Pennsylvania v. Ritchie,* 480 U.S. 39, 59-61 (1987) (defendant's right to fair trial when seeking disclosure of confidential records is adequately protected by an *in camera* review of the records). If the court determines after an in camera hearing that no records may be disclosed, a defendant is not entitled to view the documents in order to show the court abused its discretion.  *Id.*

Again, Hill's challenge to the trial court's evidentiary ruling raises no federal question because "alleged errors in the application of state law are not cognizable in federal habeas corpus."  *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996); *see also Cooper v. Brown*, 510 F.3d 870, 1001 (9th Cir. 2007) (claim of evidentiary error "fails to present a federal question cognizable on federal habeas review").

Moreover, there is no clearly established federal right to compel pretrial discovery in a situation like Hill's, particularly since the discovery he requested would not have directly provided him with a defense under California law and the trial judge conducted an *in camera* review of the records, which was affirmed by the Court of Appeals.  *See Ritchie*, 480 U.S. at 53,

64-65;[5] *see also Wood v. Alaska*, 957 F.2d 1544, 1549 (9th Cir. 1992) ("A defendant has no right

. . . to present irrelevant evidence."). Hill is thus not entitled to relief on this ground.

## C.    Juror Misconduct (Ground 4)

Hill next claims that the trial court abused its discretion when it denied his motion for a

mistrial related to alleged juror misconduct. In considering this claim on direct appeal, the Court

of Appeal laid out the following background:

> On the ninth day of trial, the prosecutor informed the court of a social networking
> contact between Juror No. 8 and the prosecutor's brother, who had observed [Hill's] trial
> the week before. When questioned about this contact, Juror No. 8 told the court that
> Facebook and Instagram suggested to her that she send a friend request to a person with
> whom she had a mutual friend. Juror No. 8 sent the request on both Facebook and
> Instagram and then realized that the person she sent the request to was a person she did
> not know and only recognized because she had seen him observing [Hill's] trial. Upon
> realizing she did not know the person she sent the request to, Juror No. 8 canceled the
> request on both Facebook and Instagram. Juror No. 8 had never met the person she sent

---

[5]    In *Ritchie*, the Court considered and rejected the Supreme Court of
Pennsylvania's decision that, in a case like this, a defendant was entitled to have his attorney
review all of a complaining witness's confidential records, with an advocate's eye, to see if there
might be information relevant to exculpation or the impeachment of adverse witnesses. 480 U.S.
at 51-56. The *Ritchie* court held that the defendant was entitled to have the trial court review the
records in camera to determine whether relevant information was available, but was not entitled
to conduct a fishing expedition through the complaining witness' records himself. *Id.* at 57-58.
The superior court followed this procedure. No Supreme Court decision reaches the next step
and determines whether, after an in camera review, the trial court committed federal error in
limiting the information disclosed. On this point, we must look to more general discussions in
Supreme Court opinions addressing unrelated facts. Of course, the more general the rules we are
applying, the more leeway the state court has in reaching a "reasonable" application. *Renico v.
Lett*, 559 U.S. 766, 776 (2010). In an abundance of caution, the Court obtained the confidential
records at issue. Docket Nos. 16, 17. This Court's independent *in camera* review confirms that
no material exculpatory evidence was withheld and, although the one document referenced in the
Court of Appeal's opinion could constitute impeachment material, the record supports the Court
of Appeal's ultimate conclusion that the "impeachment material contained in the therapist's note
was already known to [Hill], who questioned G. H. and other witnesses extensively on the
subject. Accordingly, no prejudicial error occurred." *Hill*, 2017 WL 4053221, at *5. The Court
of Appeal's rejection of Hill's claim was therefore neither contrary to, nor an unreasonable
application of, clearly-established Federal law.

the request to and had never had a conversation with him either in person or via social networking. Juror No. 8, however, surmised the person she sent the request to was somehow related to the prosecutor given that they had the same last name. Beyond that fact, Juror No. 8 knew nothing about the person she sent the request to. She further testified that she had not lost her ability to be fair and impartial.

Once Juror No. 8 left the courtroom, the prosecutor confirmed that Juror No. 8's version of events was consistent with the version her brother told her and that Juror No. 8 in fact took steps to disconnect from him after contact had been made. Neither [Hill] nor the prosecutor sought to have Juror No. 8 excused from the jury. The court agreed and noted that Juror No. 8 was very forthright in her response that she could remain fair and impartial. Further, the juror did not exchange any information with the prosecutor's brother and there was no basis for her removal from the jury.

Following the close of evidence, Juror No. 8 contacted the court on a day the jury was not to convene to inform it of another social networking contact. This time, she was contacted by the bailiff on Facebook through an anonymous message. In the message, the bailiff said, "[w]e should hang out after this trial" and signed it as "[g]uy who keeps smiling at you." Besides responding to the initial anonymous message to find out who sent it, Juror No. 8 had no contact with the bailiff. Juror No. 8 testified that the contact did not affect her ability to be fair and impartial. She also testified she would be able to remain in the same courtroom as the bailiff and his presence would not affect her ability to listen and perform her duty as a juror. During the entirety of her testimony, the bailiff was present in the courtroom.

After consulting with [Hill], defense counsel stated that she did not wish for Juror No. 8 to be excused. The court found Juror No. 8's testimony that she could be fair credible. The court also found that the social networking contacts did not pertain to the evidence or the integrity of the judicial process, and thus there was no reason to excuse the juror. Before the jury returned the next week for deliberations, the court had the bailiff removed from [Hill's] trial so that Juror No. 8 would not feel uncomfortable by his presence.

The following week, [Hill] moved for a mistrial based on juror misconduct. [Hill] argued he could not receive a fair trial because there was a substantial likelihood of bias against him on the part of Juror No. 8. [Hill] reasoned that Juror No. 8 had been singled out twice by the court and inappropriately contacted by the bailiff. He further argued that her responses to questions regarding the bailiff's conduct could not be trusted because she was questioned in front of the bailiff. Speaking with Juror No. 8 a third time to admonish her not to speak with the other jurors about the bailiff's conduct would further lead to an unfair trial because the other jurors would speculate about the reasons she continued to be singled out by the court.

The court denied [Hill's] motion for a mistrial because there was "no evidence of misconduct or prejudice by Juror No. 8 sufficient to grant [Hill's] request . . . ." The court did not presume Juror No. 8 was prejudice[d] because, to the extent she had conversations with people connected with the trial, those conversations were not related to matters pending before the jury. The juror also affirmed that she could remain impartial, and she did not appear "emotionally incapacitated or otherwise compromised

in her ability to perform the necessary functions as a trial juror."  Finally, there was no evidence that she communicated any of the social networking contacts to other members of the jury.  Given these circumstances, [Hill] "failed to demonstrate that any harm, let alone irreparable harm, occurred by either/or both Facebook contacts involving the juror."

The court then called Juror No. 8 into the courtroom for follow-up questions and admonitions.  The court assured Juror No. 8 that the bailiff had been removed from the trial for the remainder of the proceedings and then inquired whether she could still be fair and impartial given the "few days" she had to think about it. Juror No. 8 responded that she "[m]ost definitely" could be fair. The court then asked whether Juror No. 8 had shared her experience with the other jurors, to which she said she had not. The court then admonished Juror No. 8 not to disclose the Facebook contacts with the other jurors, which Juror No. 8 agreed not to do.

*Hill*, 2017 WL 4053221, at *3-4.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, *by an impartial jury*." U.S. CONST. amend VI (emphasis added).  The right to an impartial jury is further applicable to the states by way of the Fourteenth Amendment.  *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "The bias or prejudice of even a single juror is enough to violate that guarantee."  *United States v. Olsen*, 704 F.3d 1172, 1189 (9th Cir. 2013) (quoting *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000)).  However, the constitution "does not require a new trial every time a juror has been placed in a compromising situation."  *Tinsley v. Borg*, 895 F.2d 520, 524 (9th Cir. 1990) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)).  "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  *Id.* (quoting *Phillips*, 895 F.2d at 217).

The Ninth Circuit has recognized three forms of juror bias: 1) "actual bias, which stems from a pre-set disposition not to decide an issue impartially"; 2) "implied (or presumptive) bias,

which may exist in exceptional circumstances where, for example, a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury"; and 3) "so-called *McDonough*-style bias, which turns on the truthfulness of a juror's responses on voir dire" where a truthful response "would have provided a valid basis for a challenge for cause." *Fields v. Brown*, 503 F.3d 755, 766-67 (9th Cir. 2007) (citing *McDonough Power Equip. v. Greenwood*, 464 U.S. 548 (1984) (plurality)).

Hill does not argue that the juror answered questions dishonestly during voir dire, and thus his complaint appears to implicate the theory of implied bias.[6] The Ninth Circuit has concluded that, although the Supreme Court has never held that a juror was impliedly biased in absence of juror dishonesty in voir dire, concurring opinions in Supreme Court cases have not foreclosed the possibility of finding implied bias in such circumstances, and claims to that effect are cognizable on federal habeas review. *Fields*, 503 F.3d at 771-72; *see also Dyer v. Calderon*, 151 F.3d 970, 984 (9th Cir. 1998) (finding implied bias claim cognizable on federal habeas review because "[p]resumed bias dates back in this country at least to Aaron Burr's trial for treason").

However, "[i]t is well accepted that bias may be presumed only in 'extreme' or 'extraordinary' cases." *Fields*, 503 F.3d at 772. Most of the Ninth Circuit's decisions presuming bias as a matter of law have involved situations "where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the

---

[6]   On direct appeal, Hill also argued that the juror's social media contacts constituted misconduct. To the extent he re-asserts this claim here, it fails because the state courts were reasonable in finding no misconduct because "Juror No. 8's interactions with the prosecutor's brother and the bailiff had nothing to do with the case she was to decide." *Hill*, 2017 WL 4053221, at *12.

average person could remain impartial in his deliberations under the circumstances." *Olsen*, 704 F.3d at 1191 (quoting *Fields*, 503 F.70 at 770). "Prudence dictates that courts answering this question should hesitate before formulating categories of relationships which bar jurors from serving in certain types of trials." *Tinsley v. Borg*, 895 F.2d 510, 527 (9th Cir. 1990). A court might, however, presume bias where a juror or his close relatives have been personally involved in a situation with a fact pattern similar to the crime. *Id*. at 528. Hypothetically, a court might likewise presume bias where it is revealed that the juror is an actual employee of the prosecuting agency, where the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction. *Id*.

Where a hearing has been held on juror impartiality and the fact-finding process was objective and reasonably explored the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness. *Dyer*, 151 F.3 at 975. A petitioner must therefore present clear and convincing evidence to rebut this presumption. 28 U.S.C. § 2254(e)(1); *Miller-El*, 537 U.S. at 340. The Supreme Court has made it clear that on federal habeas review, the determination of juror bias "is essentially one of credibility, and therefore largely one of demeanor." *Tinsley*, 895 F.2d at 525 (quoting *Patton v. Yount*, 467 U.S. 1025, 1038) (internal quotation marks omitted). The findings of state trial and appellate courts on juror impartiality deserve "a high measure of deference." *Id*. (citation omitted).

Here, Hill has not rebutted with clear and convincing evidence the state trial court's finding of no bias. Rather, Hill urges this Court to re-assess the testimony and credibility of the juror. Federal law is clear, however, that the state court was in the best position to assess the demeanor and weigh the credibility of the juror in question. *See Yount*, 467 U.S. at 1038

("Demeanor plays a fundamental role not only in determining juror credibility, but also in simply understanding what a potential juror is saying. . . . Demeanor, inflection, the flow of questions and answers can make confused and conflicting utterances comprehensible."). As the Court of Appeal thoroughly and persuasively explained:

> [T]he court properly determined Juror No. 8 was not biased by the social networking contacts. The trial court found Juror No. 8 was credible in her affirmation that she could remain impartial. The court further found that she did not appear "emotionally incapacitated or otherwise compromised in her ability to perform the necessary functions as a trail juror." There is nothing in the record, nor does [Hill] provide a reason, for us to doubt these findings. Juror No. 8 was candid with the court about the limited social networking contacts she had with the prosecutor's brother and the bailiff, she reported her contact with the bailiff immediately after it had occurred and on a day the jury was not to convene, and she repeatedly affirmed her impartiality. Given the trial court's credibility finding, the juror's limited social networking contacts with the prosecutor's brother and the bailiff, and the juror's affirmations of impartiality, there is no evidence demonstrating a substantial likelihood Juror No. 8 was biased.
>
> [Hill's] claim that the other jurors were affected by Juror No. 8's Facebook contacts because they likely speculated about the reason she was repeatedly called before the court is similarly unavailing. Juror No. 8 stated she did not and would not tell any other juror about her social networking contacts with the prosecutor's brother or the bailiff. Given her assertion, there is no basis for a finding that the other jurors knew why she had to talk to the court outside of their presence. To leap to an inference that other jurors would see Juror No. 8 called into the court twice and then use that fact against [Hill] is pure speculation and does not support a claim of juror misconduct. Accordingly, the trial court properly denied [Hill's] motion for a mistrial based on juror misconduct.

*Hill*, 2017 WL 4053221, at *13.

In light of the deference afforded the state court's decision and the absence of clear and convincing evidence that rebuts the presumption of correctness this Court must bestow upon it, Hill is not entitled to a finding of presumed bias, and his claim must be denied.

## D. Prosecutorial Misconduct/Ineffective Assistance of Counsel (Ground 7)

Finally, although only cursorily addressed in his Petition, Hill also appears to re-allege his direct appeal claim that the prosecutor committed misconduct when she insinuated to the jury

that it should convict Hill in order to thwart future child abuse, and that counsel was ineffective for failing to object.[7]  The Court of Appeal rejected this claim as follows:

> The prosecutor's comments followed her discussion of V. H.'s credibility and pertained to the evidence presented at trial.  The prosecutor did not appeal to the sympathies of the jurors or incite them against [Hill].  She did not urge the jurors to imagine themselves or someone they knew as [Hill's] victim or urge the jurors to follow community sentiment rather than their own judgment.  Instead, the prosecutor's comments urged the jury to take its job seriously by enforcing the laws of the land and seek justice for [Hill's] victims.  A reasonable juror would not take the prosecutor's statement to protect "those who come after [G. H.]" as direction to render a verdict based on public opinion or find [Hill] guilty out of fear instead of the evidence.

*Hill*, 2017 WL 4053221, at *8 (citations omitted).

To successfully raise a claim cognizable on habeas review based on a prosecutor's comments at trial, a petitioner must demonstrate that the prosecutor's comments "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  Under this standard, only egregious prosecutorial misconduct can give rise to a constitutional claim.  *See Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir. 1995).  A prosecutor's comments in summation constitute grounds for reversal only when the remarks caused actual prejudice.  *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004) (applying harmless error test to claim of prosecutorial misconduct in summation).

---

[7]        On direct appeal, Hill raised only an ineffective assistance of counsel claim with respect to the prosecutor's comments.  To the extent Hill attempts to raise the underlying prosecutorial misconduct claim here, such claim additionally fails on exhaustion grounds.  *See, e.g.*, *Rose v. Palmateer*, 395 F.3d 1108, 1112 (9th Cir. 2005) ("[A]lthough Rose's Fifth Amendment claim is related to his claim of ineffective assistance, he did not fairly present the Fifth Amendment claim to the state courts when he merely discussed it as one of several issues which were handled ineffectively by his trial and appellate counsel.  While admittedly related, they are distinct claims with separate elements of proof, and each claim should have been separately and specifically presented to the state courts."), *cert. denied*, 545 U.S. 1144 (2005).

The Court finds the prosecutor's statements in summation troubling and close to the line of permissibility. However, the question on federal habeas review is not whether the statements were permissible, but whether they were sufficiently egregious to taint the trial. Even if the comments made in Hill's case may be condemnable and unbefitting of a prosecutor, they nevertheless are still less egregious than the types of statements that the Supreme Court has found to be insufficient to establish a due process violation based on prosecutorial misconduct. *See Darden*, 477 U.S. at 180 n. 10-12 (prosecutor did not deprive defendant of right to fair trial where prosecutor urged jury to impose death penalty by arguing that "as far as I am concerned, . . . [the defendant is] an animal," and "I wish [the decedent] had a shotgun in his hand . . . and blown [the defendant's] face off. I wish that I could see him sitting here with no face, blown away by a shotgun"). Hill thus fails to establish that the Court of Appeal's finding that counsel was not ineffective for failing to object was either unreasonable or contrary to Federal law as laid out in *Strickland*. *See United States v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991) (trial counsel may properly decide to "refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel on the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality"); *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) ("Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct."). Hill is thus not entitled to federal habeas relief on this claim.

### E.     Sentence

Although Hill does not challenge his sentence, it is nonetheless worth noting that his sentence of 300 years to life imprisonment, plus 20 years, was rather steep punishment. The Eighth Amendment, applicable to the States through the Fourteenth Amendment, proscribes the infliction of "cruel and unusual punishments." U.S. CONST. amend. VIII; *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008). The Supreme Court has held that "the only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' framework is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (citation omitted). Although Hill's sentence is harsh, in any event, he cannot demonstrate that his is one of the exceedingly rare cases in which the sentence imposed raises an inference of gross disproportionality when compared to the crime committed, particularly in light of his previous convictions. *See, e.g.*, *Ewing v. California*, 538 U.S. 11, 29-30 (2003) (sentence of 25 years to life for grand theft of $1,200 of golf clubs was not cruel and unusual); *Lockyer*, 538 U.S. at 77 (two consecutive sentences of 25 years to life for petty theft was not cruel and unusual).

## V. CONCLUSION AND ORDER

Hill is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to grant a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is directed to enter judgment accordingly.

Dated: June 5, 2019.

    /s/James K. Singleton, Jr.    
JAMES K. SINGLETON, JR.
Senior United States District Judge
